**IOWA PARK PRODUCING & REFINING CO. v. SEABOARD OIL & GAS CO.**
**(No. 2826.)**

Court of Civil Appeals of Texas. Amarillo.
May 11, 1927.

Rehearing Denied June 8, 1927.

1. **Mines and minerals &#9756;83—Agreement for seller's storing, for buyer's credit, portion of oil due seller, did not necessarily arise from buyer's failure to protest.**

Under contract for sale of seven-eighths of oil produced from certain leases, providing for payment to seller out of seven-sixteenths of total production, agreement that seller should store his share of oil for buyer's credit did not necessarily arise from buyer's failure to protest against storage, where seller's portion of oil was to be handled by pipe line company.

2. **Mines and minerals &#9756;83—Seller, accepting its portion of oil produced without agreement as to price or storage, was required to credit buyer with market value.**

Under contract of sale of oil by which portion was to be run to pipe line company in payment of purchase price, seller, on refusal of pipe line company to purchase such oil, and seller's acceptance, without agreement with buyer for storing or for price, was required to credit buyer with market value of oil at dates on which it was received.

3. **Mines and minerals &#9756;83—Market value of oil received by independent operator for buyer's credit held not "posted price" which major operators offered for limited production from connecting wells.**

Under contract of independent operator selling oil, market value of oil received by seller during depression period as credit on purchase price *held* not equivalent to "posted price," which represented amount exceeding "spot market" which major companies were willing to pay for limited percentage of production from wells with which they were connected.

4. **Mines and minerals &#9756;83—Finding that market value of oil was specified amount or "posted price" held indefinite, requiring reversal, if distinction was intended.**

In action to recover purchase price of oil and enforce vendor's lien, findings of jury that market value of oil credited to buyer was specified sum per barrel, "or posted price, at dates taken," *held* indefinite and uncertain, if jury did not intend to find market value and posted price were the same.

Appeal from District Court, Wichita County; W. W. Cook, Judge.

Suit by the Iowa Park Producing & Refining Company against the Seaboard Oil & Gas Company. Judgment for plaintiff for an amount claimed to be inadequate, and plaintiff appeals. Reversed and remanded.

Kenley, Dawson & Holliday, of Wichita Falls, for appellant.

Bullington, Boone, Humphrey & King, of Wichita Falls, for appellee.

JACKSON, J. The Iowa Park Producing & Refining Company, the appellant, instituted this suit in the district court of Wichita county, Tex., against the appellee, the Seaboard Oil & Gas Company of Texas, for debt and to foreclose a vendor's lien securing the payment thereof.

The appellant alleges that on or about June 5, 1923, it sold and conveyed to the Seaboard Oil & Gas Company, of Delaware, seven-eighths of the oil and gas on certain leases situated in Archer county, Tex., for a consideration of $525,000 to be paid as follows:

$25,000 in cash; a series of notes aggregating the sum of $325,000; and the balance, or the sum of $175,000, was to be paid out of seven-sixteenths of the oil produced, which seven-sixteenths was to be run to a solvent pipe line company until said $175,000 was paid; that in the conveyance a vendor's lien was retained to secure all of the deferred payments; that about March 15, 1924, the Seaboard Oil & Gas Company, of Delaware, sold and conveyed said leases to the appellee and as a part of the consideration therefor the appellee assumed and promised to pay to appellant the unpaid part of the consideration for said leases; that a balance of $68,000 evidenced by the last six of the series of notes, was due, and unpaid, on February 16, 1926, the date this suit was instituted; that said notes contained the usual stipulation as to the payment of attorney's fees, and because the appellee had made default it was necessary, and the appellant had placed them in the hands of its attorneys for collection and promised to pay the 10 per cent. attorney's fees, $6,800, as provided therein; that, in addition to the balance of $68,000 evidenced by said six notes, there was, of the $175,000 to be paid out of oil, a balance of $21,431.36, which appellant designates as the contingent oil fund account, due and unpaid; that, since the sale of the leases on the request of appellee, the appellant has stored certain oil for which it is entitled to a balance of $597.79.

The appellee answered by general denial, admitted the sale of the leases by appellant to its predecessor for the consideration alleged; that it purchased the property and assumed the payment of the unpaid purchase money; and that it was bound by the provisions of the contract of sale with, and the conveyance from appellant to, its predecessor.

The appellee pleaded that under the terms of said instrument seven-sixteenths of the oil from the premises was to be run in a solvent pipe line company to the credit of the appellant until the $175,000 was paid; that seven-sixteenths of the oil was run into the lines of the Texas Pipe Line Company, which was solvent, to the credit of appellant from May 22, 1923, to December 1, 1924, after which time the seven-sixteenths was run in the lines of the Humble Pipe Line Company, a solvent company, to the credit of appellant; that from May 22, 1923, until July 1st, thereafter, the appellant received and paid the appellee for the seven-sixteenths according to the posted price of the Texas Company on the dates it was delivered to the Texas Pipe Line Company; that the seven-sixteenths run in the Texas Pipe Line Company, for the credit of appellant from July 1, 1923, to December 1, 1924, was not sold by appellant, but was diverted from the pipe line company and was received in its refinery near Iowa

Park, refined and consumed, and appellant now seeks to pay for said oil at less than the contract price, which was the posted price of the Texas Company; that after July 1, 1923, the appellant refused to account for the oil so consumed, but falsely represented that it was storing it; that the price of oil, and the posted price of the Texas Company in July, 1923, to September 3d, thereafter, was $2 per barrel; that on the 3d of September the price was $1.80 per barrel; on the 20th of September it was $1.30 per barrel, and on October 9th, $1.25 per barrel; which last price continued until December 11th; that during all this time the appellant was receiving and consuming seven-sixteenths of the daily production of oil from said leases, and not storing it for the account of appellee; that about December 1, 1923, the appellant allowed appellee a false and fictitious price of $1 per barrel on all of said oil; that it was the true intent and meaning of the contract that the posted price of the Texas Company, at the dates and times the oil was delivered to the Texas Pipe Line Company, should be accepted as the standard price at which the seven-sixteenths should be paid for, and if, in fact, it is not so provided in the contract, the omission was by mutual mistake of the parties; that, should it be determined that the daily posted price of the Texas Company was not to be the standard of value, then the appellee says it should be credited with the market value of the oil, or the amount the oil brought the appellant, and in either event the oil received by appellant amounts to a sum greatly in excess of $175,000, and a credit should be allowed it upon the outstanding notes therefor; that, but for the false representations made to appellee that appellant was storing the oil for appellee's account, and the failure of appellant to allow a credit for the oil consumed at the posted price of the Texas Company, or at the fair market value of said oil, or credit it for what the oil actually brought appellant, the appellee would have liquidated all of said indebtedness, for which reason it should not pay any attorney's fees upon any balance that might be due; and that said attorney's fees as claimed are unreasonable and unjust.

The appellant, by supplemental petition, says that the true purpose and meaning and intent of the contract was that appellee and its predecessor would take possession and management of the premises, and have exclusive control and sale of the oil, for such prices as it desired, with the limitation only that the oil should be delivered to a solvent pipe line company, and the purchaser thereof should make payment for the seven-sixteenths direct to appellant, and if said contract does not so provide, it was due to an oversight or mistake on the part of the parties, and that the instrument should be so reformed as to

give it such meaning and effect; that the sale was consummated on July 3d, when actual possession was delivered, and the appellee and its predecessor has continued from that date to operate the property and sell and dispose of the oil produced therefrom. The appellant denied that it contracted to pay the posted price or any other price for the oil until it purchased a quantity of storage oil from appellee, about October 31, 1923, which had been run from the lease from July 3, to October 31, 1923, at which time it purchased, and credited appellee at the posted price for such oil, October 31st.

In response to certain special issues, which for convenience we will renumber, the jury found in effect: (1) That there was no agreement that appellant should from July 3d to October 31st, inclusive, store the seven-sixteenths of the oil for the credit of appellee; (2) that the appellee did not at any time protest to appellant about the storage of the oil in question, during the months of July, August, September, and October; (3) that there was no agreement that appellant should purchase said oil at the posted price made by the Texas Company as of October 31, 1923; (4) that the parties at no time agreed on the price to be paid for said oil; (5) that there was no agreement that appellant should pay for the seven-sixteenths of the oil run to its credit, from July 2, 1923, to October 31st, thereafter, at the current posted price of the Texas Company; (6) that appellant was due appellee, on the contingent oil fund account of $175,000, an additional credit as of April 16, 1926, of $16,066.99.

The court allowed the appellee the additional credit of $16,066.99 on the contingent oil fund account as found by the jury, and entered judgment in favor of appellant for the balance of its unpaid debt, less said credit, and the foreclosure of its vendor's lien. This appeal is based on assignments challenging, as error, the action of the trial court in allowing appellee credit for said $16,066.99.

The findings of the jury on the above issues are not challenged for want of support in the testimony, and eliminate the controversy as to the alleged agreement for appellant to store the oil for the credit of appellee; the alleged agreement of appellee to purchase the oil at the posted price of the Texas Company on October 31st; also any agreed price to be paid for said oil and any agreement by appellant to take the oil at the current posted price of the Texas Company; and all issues of mutual mistakes in the contract.

[1] The appellant presents, as error, the action of the court in allowing appellee the additional credit of $16,066.99 on the contingent oil fund, because the jury's finding that there was no agreement for appellant to store said oil for the credit of appellee is in conflict with the finding that appellee did not protest against the act of appellant in storing such oil, as appellee knew that appellant was storing the oil and acquiesced therein, which constituted an implied contract.

On May 30, 1923, the appellant, called the seller, made a contract with appellee's predecessor, called the buyer, by which the seller agreed to sell and the purchaser agreed to buy seven-eighths of the oil and gas on certain leased premises belonging to the seller. The provisions of this contract pertaining to the issues presented are:

"There is an additional payment to be made totaling $175,000, payable only out of one-half of seven-eighths of total production of oil from the leases, and this one-half shall be run to the credit of the seller in a solvent pipe line company and payable regularly by the pipe line company to the seller, until the whole of the $175,000 is paid. * * *

"The buyer is to have run to its credit one-half of the oil beginning at 7 o'clock in the morning of May 22, 1923, and shall have charge of the lease and run the oil in accordance with the terms hereof. The seller agrees to execute a release as to the cash consideration, when all payments have been made under the terms, and to execute a further release upon the oil consideration when the same has been paid in oil. * * *

"Possession is to be delivered at the time the conveyance is passed, but such possession shall relate back so as to include the amount or value of all oil run from May 22, as hereinbefore provided. When possession is delivered the buyer shall run all of the oil through the pipe line to be credited, however, from May 22d, as hereinbefore provided."

The assignment or conveyance executed July 3d, in compliance with the terms of the contract of sale, after reciting the cash consideration and the notes to be given, the amounts and due dates thereof, provides:

"There is an additional payment to be made, totaling $175,000, payable out of one-half of the seven-eighths of the total production of oil from the hereinafter described land. This one-half shall be run to the credit of the grantor in a solvent pipe line company and payable regularly by the pipe line company to the grantor, out of the proceeds of the sale of said oil, until the whole of the $175,000 is paid."

At the time of the sale the leases were connected with the Texas Pipe Line Company, a common carrier, but not engaged in the purchase of oil, but such common carrier belonged to the Texas Company, which was a purchaser of oil. Prior to the sale and conveyance the owners of the oil produced on the leases had furnished the Texas Company with a division order, certifying that appellant was the owner of seven-eighths of the oil on the leases, and authorized said company to receive the oil therefrom and credit seven-eighths thereof to the appellant. From May 22, 1923, until July 3d, thereafter, seven-eighths of the oil from the leases was run to appellant, seven-sixteenths of which was applied at the posted price of the Texas Com-

pany, during that period, to the payment of a part of the $25,000 cash consideration, and seven-sixteenths thereof was applied, at the posted price of said company, as a credit upon the $175,000 obligation to be paid to appellant out of seven-sixteenths of the oil. On July 3, 1923, the Texas Company was furnished with a new division order, executed by plaintiff and appellee's predecessor, advising that appellant had transferred seven-sixteenths of the oil produced from said leases, and authorized the Texas Company, beginning at 7 o'clock a. m., July 3, 1923, to credit appellee's predecessor with seven-sixteenths of the oil received from said leases.

On July 12th, the appellant wrote appellee:

"As per our conversation with you and Mr. Sterling, we are continuing to run the oil from leases purchased of us to our refinery for storage for your account, which we will be very glad to do as long as we can until you have made some satisfactory arrangements for taking care of the oil. As the Texas Company is demanding that all oil be moved out of their lines and storage promptly, we are finding it necessary to transport this oil to our storage; therefore, as fast as it accumulates in the line, same will be run to our storage for your account, and we will render statement for the amount received, and also statement for transportation charges, which will be 17½ cents per barrel from the field to our plant. We will also charge your account with the regular storage charges, shrinkage, and insurance customarily charged by the Texas Company and other major companies.

"When the oil comes into our storage, it may be possible that if you should sell a certain amount of oil that under present circumstances, we could not deliver it because of lack of oil in Texas Pipe Line Company's storage, due to the fact that as above stated they are insisting on our removing all oil from their storage daily and because we do not believe they will permit us to run oil from our plant into their line for delivery to other customers on their line, in which event, we cannot bind ourselves to deliver any oil that you may desire to have transferred promptly, but we will deliver same as quickly as it can be accumulated in our line for transport as per your order.

"Please advise us if this meets with your approval, and, if not, please arrange with the Texas Company to relieve us of the responsibility of caring for this oil."

On July 13, 1923, appellee wired appellant:

"Acknowledging receipt your letter 12th relative to running of oil from property purchased at Iowa Park, advise we neglected to advise you when in the office of our arrangement with Mr. Donnohoe, of the Texas Company, by telephone, to run this oil to our account from July 3d on. Presume Wichita Falls office of Texas Company has been so advised."

On July 17th, appellee wrote appellant:

"Acknowledge receipt of your favor of 12th, herewith hand you copy of wire which we sent you in response thereto. We have sent the Tex-

as Company, Wichita Falls, copy of the assignment made by your company to us, with advice that Mr. Donahoo had agreed to run the oil to our account from morning of July 3d. They would not agree to buy the oil, indicating, however, that, at a later date, they would try to arrange to do so. I presume, of course, on account of your being so crowded with oil, that this arrangement will be more than satisfactory with you. * * *"

On October 22, 1923, the appellee wrote appellant:

"The Texas Company has recently advised us that they expect to pay for all oil in storage from the Taylor & Ferguson leases, and presume check will go forward to your company in the very near future covering all oil in storage at the present posted price, which I am sure will be welcome news to you. * * *"

On October 26th, appellant wrote appellee:

"Replying to your letter of 22d, will advise that the Texas Company has said nothing to us about paying for the oil in question, and we do not believe that they will take our seven-sixteenths, so, therefore, under the circumstances, if you will agree to it, we will credit your account for the oil in storage at the prevailing posted price at this time for the gravities run from the leases, and in that manner we can adjust the oil account up to October 1st.

"This, of course, does not contemplate changing our contract in any manner and is merely a purchase of your oil which is stored and for convenience in arriving at some method of getting our money out of seven-sixteenths of oil due us. * * *"

On November 1st, appellant wrote appellee:

"We are just in receipt of your letter of the 26th, and, in reply to the first paragraph thereof, advise you may credit our account for seven-sixteenths of the oil produced from the Taylor & Ferguson leases from July 3d to October 15th, at the prevailing posted price according to the gravities, with the distinct understanding that, if you have been taking all or any part of the seven-sixteenths of the oil mentioned at any time since July 3d, and we are able to make such a showing, instead of crediting us at the present posted price as stated, that we shall be credited at the posted price prevailing at the time you took said oil, if any. Our reason for the latter statement is that the Texas Pipe Line Company advises us that the oil in question was transferred to your credit on the date it was run into their line and credited to your account on those dates, and was under your control from and after that date. Therefore, if such was the case, or if in the general amount of oil that was run to your credit by the Texas Pipe Line Company you took any of this oil, you would under either alternative be liable to us for the posted price at that particular time. * * *"

On November 8th, the appellant wrote appellee:

"Replying to your letter of November 1st, in answer to our letter of 26th of October, in which you advise that we may credit your account with seven-sixteenths of the oil produced from Tay-

lor & Maxson leases from July 3d to October 15th, at the present posted prices according to gravities, but in which letter you qualify this offer by stating if we have been taking all or any part of the seven-sixteenths of the oil mentioned since July 3d, and that you will be able to make such showing, that you expect us to credit you at the price posted at the time we took said oil.

"This will not be satisfactory to us for the reason that, as you know, we told you we would store this oil for your account in order that oil produced by these leases might be run; the Texas Company having declined to store the oil for us and having insisted that all of this oil be taken out of their lines as fast as the same was run. Not only did they insist upon this oil being moved, but all other oil which we had any interest in, and therefore, in order to satisfy the demands of the Texas Company, it was necessary for us to move oil. However, we have at all times a certain amount of oil in the Texas Company line, and unless you desire us to purchase the oil due from these leases at present prices, we prefer to tender you and do hereby tender you said oil."

The officers of appellee testified that, in the correspondence above, they referred to, and understood that appellant referred to, the seven-sixteenths of the oil that had been transferred to, and was to be run to the credit of appellee. The appellant's representative testified that they referred to, and understood such correspondence to refer to, the seven-sixteenths of the oil which was to be run to the credit of appellant, and out of which the $175,000 was to be paid. The statements furnished by appellant to appellee from time to time of the seven-sixteenths of the oil it received show that appellant was giving appellee credit for such oil at the current posted price.

This correspondence could refer to the entire seven-eighths of the oil, but both parties interpreted it as referring to but seven-sixteenths thereof. Hence it could refer to the seven-sixteenths transferred and credited to appellee, or the seven-sixteenths credited to appellant, for the payment of the $175,000 obligation. From this it is apparent that the correspondence is ambiguous and uncertain. If the parties understood this communication, as they respectively testified, there was no meeting of the minds, as to the oil to be stored, and if appellee understood that the correspondence referred to the seven-sixteenths of the oil to be run to the credit of appellant, especially in view of the statements furnished to appellee by appellant, there was no reason for appellee to protest relative to the storage of said oil, as it had arranged with the Texas Company to handle its seven-sixteenths of said oil. These two findings are in accord with this view of the record, are not in conflict, and this assignment is overruled.

During July, August, September, and October it is uncontroverted that seven-sixteenths of the oil was run in the Texas Pipe Line Company, to the credit of appellant, regularly delivered to and accepted by appellant, and thereafter in its actual possession, and the major portion thereof was consumed in its refinery.

[2] The contract of sale and the assignments stipulate that the seven-sixteenths of the oil run and credited to appellant should be paid for regularly by the pipe line company; the division orders require the pipe line company to credit appellant with said seven-sixteenths of the oil. Obviously, the parties did not contemplate the difficulties arising from the Texas Company refusing to purchase the oil and no provision was made in the contract for such a contingency. The depression in the oil business came; the Texas Company refused to purchase appellant's oil and refused to store it. Had the pipe line company delivered the oil to any one other than appellant, it would have been liable for conversion. Shreveport-Eldorado Pipe Line Co. v. Bennett (Ark.) 290 S. W. 929; Elliott, Jones & Co. v. Waurika Oil Association (Tex. Civ. App.) 253 S. W. 601; Harris Millinery Co. v. Bryan, 59 Tex. Civ. App. 477, 125 S. W. 999. The pipe line company delivered the oil to appellant, and it accepted the oil without any agreement with appellee for storing it, and without any agreement as to the price to be paid therefor, and appellant had, before offering to purchase the oil, and before making a tender thereof to appellee, consumed the oil in its refinery and became liable to appellee for the market value of the oil at the dates upon which it was received.

[3] The appellant challenges as error the action of the trial court in rendering judgment allowing appellee a credit of $16,066.99, based on the answers of the jury that the market value of oil during July, August, and September was "$2 per barrel or posted price at dates taken," and during October, "$1.41, or posted price the dates taken, per barrel," first, because the findings of the jury that the market value of oil for the months in question was unsupported by the testimony, and, second, because each of such findings contain two distinct answers to each issue, as the uncontroverted evidence shows that the "market value" of oil, and the "posted price" thereof, was not the same.

The record discloses that in this field, during July, August, September, and October, which is designated by the witnesses as the proration period, a depression in the oil business existed and there was in the main three prices paid for oil of the kind and gravity involved in this controversy. In some instances independent refineries, before the depression came, contracted to take oil from certain producers at a premium above the posted price of the major companies. Under these contracts the price paid was the premium

above the "posted price," but certainly did not constitute the "market value." The owners of the pipe line companies, who constituted the major purchasers, refused to make any new connections with producers for the purchase of oil. On July 18, 1923, the Texas Company issued a proration order, advising the producers, with which the Texas Pipe Line Company was connected, that it would limit its purchases to 70 per cent. of the production from the wells connected with said pipe line company. Effective August 17th, the Texas Company issued another proration order, limiting its purchases to 35 per cent. of the production from wells connected with the pipe line company. The other major companies acted under similar regulations and in harmony with the proration orders of the Texas Company, and posted the price they would pay for this limited percentage of the production of the wells with which they were connected, and this constituted the "posted price." If a producer had no contract by which he received a premium above the posted price, or was not connected with the pipe line companies, or was an independent operator, and had oil in excess of the limited per cent. that the major companies would buy, he was forced to sell on what is designated as the "spot market."

The evidence is uncontroverted that the posted price for the limited amount of oil that the major companies would buy under their proration orders was much higher than what was paid for or could be obtained for oil on the spot market, and a large portion of the production in this field was bought and sold on the spot market.

The appellant was an independent operator, and the companies refused, during this proration period, to buy from it, even the limited percentage announced in their proration orders. The appellee arranged with the Texas Company to handle its seven-sixteenths of the oil from these leases, but said company would not agree to buy the oil "indicating, however, that at a later date they would try to arrange to do so." Under this arrangement with the Texas Company, the appellee received from said company $8,426.14 less for its seven-sixteenths of the oil than the findings of the jury and the judgment of the court charge appellant for the same quantity and gravity of oil from the same wells, for the same period.

Under these conditions, the appellant contends that the price that was paid for oil of this kind and character, on the "spot market," was the price of oil in the open market, or the market value with which it should be charged, for the seven-sixteenths of the oil delivered to it during this period. The appellee contends that the posted price of the major companies may be accepted as the "market price" if said companies are buying oil, and paying the "posted price" therefor, and as the testimony shows that said companies were purchasing oil at the posted price, during said period, that such price must be accepted as the market price, or market value of oil, relying on American Refining Co. v. Staley (Tex. Civ. App.) 274 S. W. 272; American Refining Co. v. Sims Oil Co. (Tex. Civ. App.) 282 S. W. 894.

It will be noted that the opinion in the case, supra, was based upon the construction of the written contract, which provided that the oil received should be paid for "at 25 cents per barrel premium over and above the posted market price of the Texas Pipe Line Company * * * on the day in which it is received by the purchaser into its custody," and the court says:

"The parties have agreed, as they clearly had the right to do, that the market price, as posted daily by the Texas Company, should be the standard which would fix the value of the oil received by appellant on that particular day. So long as said company posted a price and actually paid that price for oil, it cannot be successfully contended that the standard has failed,"

—and holds that parole testimony was not admissible to show a different price from the standard of value placed in the written contract.

The contract in the instant case contains no such provision and carries no stipulation for any standard of value, and the findings of the jury that there was no agreement that appellant was to pay the current posted price and no agreement as to any price show that the American Refining Co. v. Staley, supra, is not authority for appellee's contention, and that market value controls.

"Just what elements go to make up market value depend largely upon the facts and circumstances surrounding the particular case. There is no inflexible rule. 'Market value' implies the existence of a market; that is, a demand or want. It relates to buying and selling. Market values are created and controlled by the condition of the market with reference to supply and demand. So market value is ordinarily arrived at by conclusions deduced from transactions in commodities or property of the same or a like character. But such transactions must occur under ordinary and normal conditions, in the market generally, in open market, on fair competition, for cash, or on such time and terms as would be equivalent to cash, unaffected by elements which enter into transactions made outside the usual course of business, irrespective of peculiar circumstances." 38 C. J. p. 1262, par. 18.

The purchase of oil by the major companies was restricted largely to the producers with which their pipe lines were connected and limited to a percentage of the oil run by such producers. This was a market restricted to certain producers and the quantity taken from each producer limited by the proration order, and under the facts revealed by this record, appellant was unable

to sell his oil at the posted price to the major companies, because not in the class from whom they were purchasing oil. The term "market value," as applied to the facts revealed by this record, should be considered as meaning the price at which such oil would sell on the open market "unaffected by elements which enter into transactions made outside the usual course of business irrespective of peculiar circumstances." American Ry. Express Co. v. Parisian Hat Co. (Tex. Civ. App.) 240 S. W. 947.

[4] If we are correct in the foregoing conclusions, it follows that the "market value" of oil was not the same as the "posted price" of the major companies, and if the jury intended by the findings to say that "market value" and "posted price" are the same, such findings are unsupported by the testimony. If the jury did not intend to find that "market value" and "posted price" are the same, then the findings are indefinite and uncertain. This assignment will be sustained.

In view of the record, the other assignments do not present reversible error.

The judgment is reversed, and the cause remanded.