

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

GROVER SELLERS
XX~~WILL WILSON~~XX
ATTORNEY GENERAL

Honorable Bascom Giles
Commissioner, General Land Office
Land Office Building
Austin, Texas

Opinion No. O-7149

Re: Whether remittance
of royalty on certain
University lease com-
puted on a basis of
10¢ per barrel below
posted price is autho-
rized under the facts
submitted, and related
question.

Dear Sir:

  Your letter of March 29, 1946, requesting an opinion
on the above condensed and related question has been given our
careful consideration.  For the purposes of this opinion, we
quote your letter in its entirety.

  "I have heretofore sent you a photostatic copy of the
lease from Mineral File No. 17810 on Section 17, Block 14,
University Lands, Crockett County, which lease was issued under
the provisions of Chapter 282, Acts of the Regular Session of
the 41st Legislature, 1929, which lease is now owned and ope-
rated by Gilcrease Production Company.

  "Preliminary to the questions which I desire to ask
you with respect to this lease, I want to make the following
statement:  Paragraph 2 on page 1 of the lease which sets out
the royalty to be paid on oil reads as follows:

  "2.  Lessee agrees to pay or cause to be paid during
the term hereof:

  "(a.)  As a royalty on oil the sum of one-eighth of
the value of the gross production based on the highest posted
price, plus premium, if any, offered or paid for oil of like
gravity in the general area or one-eighth of the gross pro-
duction, the same to be delivered at the wells or to the cre-
dit of the Lessors into pipe lines to which wells may be
connected.

  "At the time this lease was brought into production,
there was no pipeline immediately adjacent to the field, and
the Gilcrease Production Company built a gathering system some

ten miles in length to transport the oil to a connection
with a common carrier pipeline at, or near, McCamey, Texas.
Gilcrease Production Company has claimed a deduction of 10¢
per barrel from the posted price in the general area to reim-
burse itself for this gathering, or transportation cost. How-
ever, it has remitted the full posted price from year to year
under protest, as to the 10¢ per barrel discussed above.

"The gathering system mentioned in the preceding
paragraph is owned and operated by Gilcrease Production Company. It
does not hold itself out as a common carrier. It has no tariff
approved by and filed with the Railroad Commission, though it
does carry a small amount of oil for two other operators in
the field on what it calls a rental basis of 15¢ per barrel.
The Humble Oil and Refining Company or the Humble Pipeline
Company, whichever purchases the oil, pays to each operator
an amount of 5¢ per barrel to cover a gathering service which
is ordinarily performed by the purchasing company. The Gilcrease
Production Company is now asking to be permitted to make remit-
tances for royalties on a basis of 10¢ per barrel less than
the posted price which it receives for the oil at the pump
station at McCamey, and is also asking that a refund of appro-
ximately $6,000, which it has paid under protest, be returned
to it, which said sum of $6,000 is represented by the 10¢
per barrel less than the posted price at McCamey, which it has
paid under protest and which it claims it is entitled to as a
gathering or transportation charge.

"All of the royalty received from the protesting
company has been deposited to the credit of the Permanent
University Fund, and the company asks that it be permitted
to withhold part, or all, of the royalty due from this lease
until it has recovered the said sum of approximately $6,000
paid under protest.

"This lease was executed under the provisions of
Chapter 282 of the General and Special Laws, 41st Legislature,
Regular Session. Let me call your attention especially to
Section 11, Page 619 of said Chapter 282, which deals with the
question of royalties, and to Section 18, Page 621 of the same
Act with respect to the powers of the Board to adopt proper
forms, regulations, rules and contracts.

"Gilcrease Production Company has been selling this
oil at its delivery point at, or near, McCamey, Texas, at the
posted price for this grade of crude in that general area. I
would like to have your answers to the following questions:

"1.   Is there any authority under the law to grant
this Company permission to remit for royalties on a basis of

10¢ per barrel below the posted price for this grade of crude at McCamey, the nearest concentration point?

"2. Is there any authority for refunding to this Company the sum of approximately $6,000, which was paid under protest as recited herein?"

The following further facts related to a full discussion of the problem here involved as supplied to this department by competent and reliable parties are also stated. There are 23 wells from which all of the production involved in this discussion is obtained. Until quite recently the oil could not be marketed, but was stored in a central storage space. The Gilcrease Oil Company is the principal operator in this area. Although there are several pipelines quite near the Gilcrease-University Field, there is no market in the field, no posted prices in the field, and no purchasers in the field.

The Yates Pool is about 10 miles southwest of the production located in the Gilcrease-University area. The Taylor Link Field is some 15 to 20 miles southwest. The Big Lake Field is 23 miles northeast. The McCamey Field is about 16 miles northwest. The pipelines passing near the area involved, the Gilcrease-University Area or field, carry Yates oil. They will not take this oil because they refuse to mix it with the Yates oil on account of its higher sulphur content than the Yates oil. For this reason, there is no market in the field. The McCamey oil is from a different horizon and is a different grade and gravity of oil. The wells in the McCamey field are some 2300 feet in depth; those in the Gilcrease-University Field are only some 1350 to 1400 feet in depth, where the formation is sand and lime.

Notwithstanding the differences in the McCamey oil, the Humble Oil & Refining Company offered a market at Hurdle, some 4 miles distant from the field now under consideration, but refused to build a line or to extend their line to the field necessitating on the part of Gilcrease Oil Company the building of a pipeline to Hurdle, for purposes of marketing the oil.

The specific terms of the lease contract, Mineral File No. 17810, on Sec. 17, Block 14, University Land, Crockett County, Texas, executed under authority and by virtue of Act 1929, 41st Legislature, Regular Session, Chapter 282, as amended by Act 1931, 42nd Legislature, Regular Session, Chapter 174, provides as a royalty provision to be paid on oil as follows:

"2. Lessee agrees to pay or cause to be paid during the term hereof:

(a) **As a royalty on oil the sum of one-eighth of the value of the gross production based on the highest posted price, plus permium, if any, offered or paid for oil of like gravity in the general area** or one-eighth of the gross production, the same to be delivered at the wells or to the credit of the Lessors into pipelines to which wells may be connected.

Thus, the immediate problem before us clearly appears to be the determination of the proper value on which royalty shall be paid to the General Land Office for the use and benefit of the University Permanent School Fund, by virtue of the terms of the lease in question, subject to its pertinent statutory provisions.

Assuming the verity of the facts herein set out, the McCamey field or area which is about 16 miles northwest of the Gilcrease-University field area, is the closest area or place where a posted price for a market has been found for the oil in question. We have been unable to find a statute or a case defining or determining the term "general area" as such term is used in the lease in question. It is the commonly recognized practice, however, for oil purchasing companies to post prices for oil of a specific kind and gravity which they will pay for designated amounts of oil in each and every field from which they elect to purchase. Iowa Park Producing and Refining Company vs. Seaboard Oil and Gas Company, 296 S. W. 697, 701. In view of this practice, we believe that the price posted for the oil in question in the McCamey Field area, an area which is entirely distinct, and about 16 miles distant from the Gilcrease-University Field Area, is not the posted price intended under the lease agreement to be used as a price basis for determining the state royalty under the lease. We are of the opinion that the term "general area" as used in the lease was intended to mean and does mean the Gilcrease-University Field Area. We do not agree with the claim of the Gilcrease Oil Company for a deduction of 10¢ per barrel from and based on the posted price as fixed in the McCamey Area, as a proper basis for determining the royalty payment it shall make to the State.

The lease contract in question specifically provides "as a royalty on oil the sum of one-eighth of the value of gross production", and then reads, "based on the highest posted prices, etc." A careful study of the statutes under which this lease was executed and the terms of the lease in its entirety leads us to conclude that the lessee under this lease on University Land, in view of the stated facts and circumstances, is obligated

to pay royalty, using as a basis the value of the gross production in the University-Gilcrease Field Area which royalty is made payable by statute in money, or its equivalent, to the Commissioner of the General Land Office at Austin, Texas. Arts. 2603, Vernon's Annotated Civil Statutes, Sections 4, 5, 6, 11, 14 and 18; that furthermore, "value of gross production, as used in the lease executed subject to the provision of the quoted statutes was intended to mean and does mean "market value".

We believe that the Land Commissioner in the year 1933 obligated as he was to execute a lease which would obtain the highest royalty possible on University Land for the use and benefit of the University Permanent Fund, inserted therein the phrase, "based on the highest possible price, etc.", through an abundance of precaution and to secure by contract for the University fund a royalty based on the highest prices available for oil from University land in that well area. In 1933, when many of the Texas oil fields were experiencing depression markets, posted prices of major oil companies for limited purchases certainly did not constitute the open and free market value. Posted prices for limited purchases of oil were then higher than prices obtainable on the spot market. 296 S. W. 697, supra. We understand that, ordinarily, posted prices fixed by the major oil companies, when there is an open market for oil, constitutes the market value for oil in the posted area during the time posted.

Your question under consideration seems to be the value, i. e., market value, of the oil at the mouth of the well, rather than one of transportation costs, although it would be futile to attempt to arrive at the value without giving consideration to the expense of transporting the oil to a free and open market. This is a fact question and not a legal one. In the case of Haines et al v. Southwest Natural Gas Company, et al, 123 Fed. (2d) 1011, Circuit Court of Appeals, Fifth Circuit, Judge Hutcheson in writing the opinion had this to say about a similar situation:

"In long drawn out controversies, arising in Louisiana, we have had recent occasion to canvas and determine, the meaning and effect of a market value clause in a gas lease, the requirements of proof with respect thereto, and the rights of the parties thereunder. We have there made it clear that such a clause makes the value at the well controlling, that it is only where the proof shows there is no market value at the well that prices obtained in the vicinity thereof, can be resorted to, and that this resort is only for the purpose of the light they throw on market value at the well and not for the purpose

of obtaining those prices.  Under the principles there announced plaintiff's case completely fails."

In the case above cited the plaintiff was attempting to recover instead of 6¢ per thousand which had been paid them by defendants, "as the market value at the well", of their royalty gas, an amount of 75¢ per thousand, the price at which defendant marketed the gas in neighboring towns.  Judge Hutcheson cites other authorities as follows:  (78 Fed. (2d) 924; 84 Fed. (2d) 436; 117 Fed. (2d) 225--holding market price at value at well was question of fact for jury; 117 Fed. (2d) 231).

In an opinion written by Cecil C. Rotsch, Assistant Attorney General, on April 26, 1939, this question was discussed as follows:

"This question of the basis on which a producer should pay royalty, where the lease contract is not clear, has been acted on by courts in Kansas, Kentucky and Louisiana.  In the case of Scott v. Steinberger, (Kan. Sup. Ct.) 113 Kan. 67, 213 Pac. 646, the court said:

"'* * * the dispute arises whether the plaintiff was entitled to the value of the gas at the wells or at the price at which it was sold at the end of the pipe line. * * *

"'The terms of the lease are somewhat ambiguous as to the point where the gas was to be measured and its price fixed.  There was no pipe line in the vicinity when the contract was made.  Evidently the parties contemplated that, if oil or gas in paying quantities was found, some pipe line company would build into the field and transport it to places of consumption. ***'

"'We think the parties contemplated and the provision should be construed that gas, if produced, should be measured and the price determined at the place where the wells were connected with pipe lines, and not at some distant market that might be found at the end of a pipe line remote from the field and where the cost of transportation might equal or exceed the value of the gas produced.  If the pipeline had been built by defendants to Kansas City or Chicago, and the gas transported and marketed there at four or five times its value at the place of production, would it be contended that the price received at either of these distant markets should be the measure of defendants liability?'* * *

"In the case of Warfield Natural Gas Co. v. Allen, (Ky. Ct. App.) 261 Ky. 840, 88 S. W. (2d) 989, the Court said:

"'The lease recited, 'That the Lessee is to deliver to the Lessor in tanks, tank cars, or pipe lines a royalty on one-eighth (1/8) of all oil produced and saved from the premises, and to pay for each gas well from the time and while the gas is marketed the sum of one-eighth of proceeds received from the sale thereof, payable each three months.'

"'Defendant had the exclusive right to produce the gas and to market the gas. It was as much its duty to find the market as to find the gas. * * *

"'The lease is silent as to where this market must be found. In such cases, it is usually held to be at the place of production. * * *

"'So we can say the defendant took this gas at the well, and the question is what must it pay for it. Must it pay its value there or must it pay what it may ultimately have got for it?

"'The testimony of the plaintiff J. H. Allen shows gas is usually sold at the well in the locality where these wells are situated and the 12 cents per thousand feet is the usual price in that locality, and that this price and custom prevailed there when these leases were made. Then that must have been what the parties contemplated when they made this lease. * * *

"'Nothing was said in the lease about a sale elsewhere and this lease must be held to mean one-eighth of the gross proceeds of a sale of the gas at the well side, and that is all for which defendant must account even though it may market the gas elsewhere and get a much greater sum for it. * * *'

"In the case of Wall v. United Gas Public Service Co., (La. Sup. Ct.) 178 La. 908, 152 Sou. 561, the Court said:

"'In the lease contract here involved, the lessee was required to pay to the lessor one-eighth of the value of the gas sold off the premises, calculated at the 'market price' thereof. The price to be paid was left open or made to depend upon the 'market price' at the time the gas was produced. The lessee settled with the lessors for the gas at 4 cents per thousand cubic feet, which it contends was the 'market price' at the well, its theory being that the market price there is the proper basis for the settlement. It admits that it sold the gas at a place two miles from the field at 5.8 cents per thousand cubic feet. The plaintiffs demand settlement on the basis of the sale price of the gas where sold.

"'There is nothing in the contract itself nor in the testimony to show the intent of the parties touching the question whether the term 'market price' meant the price at the well or the price the gas would bring in a market remote from the well. We think it reasonable to assume that the parties intended that, if there was a market for gas in the field, the current market price there should be paid. There is where the gas was reduced to possession and there is where ownership of it sprang into existence. The result of bringing the gas to the surface of the ground in the field was to reduce to ownership there to a commercial commodity. * * * *'"

Usually, the price paid for oil by the purchasing company is a proper criterion on which to figure "market value", but a producer and a purchaser, perhaps, might enter into a contract for a price less than the market value for reasons known only to themselves, and such a price in that case should not be taken as market value. Art. 2603a. Sec. 11, Vernon's Annotated Civil Statutes and paragraph 7 of the lease require the lessee to file sworn monthly statements with the Land Commissioner showing, among other data, the market value of oil sold on the premises; and the lessees' accounts, etc., pertaining to transportation, sale and marketing of the oil, are at all times subject to his inspection.

Our answer, therefore, to your first question is in the negative; that under the facts of the case in question, the royalty payable to the State under the said lease should be computed on the basis of the actual market value of oil at the Gilcrease-University field area, and you are advised that if the oil has no market value in that area, you may determine its market value at the area by taking the actual market value where there is a market and deducting the reasonable cost of taking the oil to that market. The determination of what is a proper and reasonable transportation charge is a question which is not within the province of this department to answer. This opinion does not hold, nor is it intended to hold that deductions for the gathering system of the Gilcrease Company be considered in arriving at a reasonable transportation charge.

Article 8, Section 6 of the Texas Constitution, reads as follows:

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years, except by the first Legislature to assemble under this Constitution, which may make the necessary appropriations to carry on the government until the assemblage of the Sixteenth Legislature."

This department has been advised that the sum of money paid by the Gilcrease Company under protest, approximating $6,000.00, has been deposited in the Texas Treasury to the use and benefit of the University Permanent Fund. In the absence of a specific appropriation by the Legislature authorizing payment of the stated sum, our answer to your second question must be in the negative. The remedy of the Gilcrease Company, if any, lies in the Legislature. We do not attempt, in this opinion, to construe whether or not the Gilcrease Company has a valid claim against the State of Texas for the money paid under protest.

Trusting the above satisfactorily answers your inquiry, we are

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By /s/ E. M. DeGeurin

E. M. DeGeurin,
Assistant.

APPROVED APR 25 1946
/s/ Groover Sellers
ATTORNEY GENERAL OF TEXAS

EMD:rt:br